**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SONOMA FILMS LLC,

              Plaintiff,

      v.

CENTRAL INTELLIGENCE AGENCY,

            Defendant.

Case No. 22-cv-3421-RDM

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

BALLARD SPAHR LLP

Maxwell S. Mishkin (#1031356)
1909 K Street NW, 12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Fax: (202) 661-2299
mishkinm@ballardspahr.com

*Counsel for Plaintiff Sonoma Films LLC*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND AND PROCEDURAL HISTORY ..................................................................... 3

I.      Ante Pavelic and Father Krunoslav Draganovic .............................................................. 3

II.     The Nazi War Crimes Disclosure Act ............................................................................... 4

III.    Sonoma's FOIA Request And The CIA's Response .......................................................... 6

IV.     This Lawsuit ....................................................................................................................... 8

ARGUMENT ................................................................................................................................. 9

I.      STANDARD OF REVIEW ................................................................................................ 9

II.     THE CIA FAILS TO JUSTIFY ITS WITHHOLDINGS ................................................. 10

        A.      The CIA Improperly Applied General FOIA Exemption Standards
                Instead Of The NWCDA's Heightened Standards For Nazi War
                Criminal Records ................................................................................................. 11

        B.      Even Under Ordinary FOIA Exemption Standards, The CIA Has Not
                Justified Its Withholdings ................................................................................... 16

                1.      The CIA Has Not Justified Its Withholdings Under Exemption 1 ........... 16

                2.      The CIA Has Not Justified Its Withholdings Under Exemption 3 ........... 18

                3.      The CIA Has Not Justified Its Withholdings Under Exemption 6 ........... 20

III.    THE CIA HAS NOT JUSTIFIED WITHHOLDING ANY RECORDS IN FULL ......... 22

IV.     THE CIA FAILED TO CONDUCT A LEGALLY ADEQUATE SEARCH ................... 23

CONCLUSION ............................................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                        **Page(s)**

*ACLU v. Dep't of Justice,*
    655 F.3d 1 (D.C. Cir. 2011) ................................................................................20

*Advanced Energy United v. FERC,*
    82 F.4th 1095 (D.C. Cir. 2023) .........................................................................11

*Am. Immigr. Lawyers Ass'n v. Exec. Office for Immigr. Rev.,*
    830 F.3d 667 (D.C. Cir. 2016) ...........................................................................20

*Bartko v. Dep't of Justice,*
    898 F.3d 51 (D.C. Cir. 2018) .............................................................................10

*Campbell v. Dep't of Justice,*
    164 F.3d 20 (D.C. Cir. 1998) .......................................................................19, 20

*CNN v. FBI,
    384 F. Supp. 3d 20 (D.D.C. 2019) ............................................................16, 17, 19

*Dep't of Air Force v. Rose,*
    425 U.S. 352 (1976) ........................................................................................9, 10

*Duenas Iturralde v. Comptroller of the Currency,*
    315 F.3d 311 (D.C. Cir. 2003) ...........................................................................25

*EPIC v. Dep't of Homeland Sec.,*
    926 F. Supp. 2d 311 (D.D.C. 2013) ...................................................................22

*Founding Church of Scientology v. NSA,*
    610 F.2d 824 (D.C. Cir. 1979) ...........................................................................23

*Gardels v. CIA,*
    689 F.2d 1100 (D.C. Cir. 1982) .........................................................................18

*Hertzberg v. Veneman,*
    273 F. Supp. 2d 67 (D.D.C. 2003) .....................................................................22

*In Def. of Animals v. NIH,*
    543 F. Supp. 2d 83 (D.D.C. 2008) ......................................................................9

*Jud. Watch v. Dep't of Def.,*
    715 F.3d 937 (D.C. Cir. 2013) ...........................................................................16

*Kimberlin v. Dep't of Justice,*
    139 F.3d 944 (D.C. Cir. 1998) ...........................................................................22

*Krikorian v. Dep't of State*,
    984 F.2d 461 (D.C. Cir. 1993) .......................................................................18, 19

*Larson v. Dep't of State*,
    565 F.3d 857 (D.C. Cir. 2009) ...............................................................................9

*Long v. ICE*,
    279 F. Supp. 3d 226 (D.D.C. 2017) .....................................................................23

*Mead Data Cent. v. Dep't of Air Force*,
    566 F.2d 242 (D.C. Cir. 1977) .......................................................................22, 23

*Nat'l Ass'n of Retired Fed. Emps. v. Horner*,
    879 F.2d 873 (D.C. Cir. 1989) .......................................................................20, 21

*NPR v. Dep't of Homeland Sec.*,
    No. 1:20-cv-2468-RCL, 2022 WL 4534730 (D.D.C. Sept. 28, 2022)...................19

*Oglesby v. Dep't of Army*,
    920 F.2d 57 (D.C. Cir. 1990) .........................................................................10, 23

*Pub. Citizen v. OMB*,
    598 F.3d 865 (D.C. Cir. 2009) .........................................................................9, 10

*Republic of Sudan v. Harrison*,
    587 U.S. 1 (2019) .................................................................................................12

*Rosenberg v. Department of Defense*,
    342 F. Supp. 3d 62 (D.D.C. 2018) .......................................................................17

*Rosenberg v. Dep't of Def.*,
    442 F. Supp. 3d 240 (D.D.C. 2020) .....................................................................17

*SafeCard Servs. v. SEC*,
    926 F.2d 1197 (D.C. Cir. 1991) ...........................................................................23

*Schrecker v. Dep't of Justice*,
    349 F.3d 657 (D.C. Cir. 2003) .............................................................................21

*United States v. Braxtonbrown-Smith*,
    278 F.3d 1348 (D.C. Cir. 2002) .....................................................................12, 14

*\*Valencia-Lucena v. U.S. Coast Guard*,
    180 F.3d 321 (D.C. Cir. 1999).................................................................10, 23, 25

*Wilderness Soc'y v. Dep't of Interior*,
    344 F. Supp. 2d 1 (D.D.C. 2004) .........................................................................22

*WP Co. v. Dep't of Def.*,
  626 F. Supp. 3d 69 (D.D.C. 2022) ...................................................................21, 22

**Statutes**

5 U.S.C. § 552 ...........................................................................................16, 18, 20, 22

50 U.S.C. § 3024 ..................................................................................................................18

50 U.S.C. § 3507 ..................................................................................................................18

*Nazi War Crimes Disclosure Act, Pub. L. No. 105-246 .................................... *passim*

**Other Authorities**

143 Cong. Rec. S11764 .....................................................................................................13

144 Cong. Rec. H7295 ...............................................................................................12, 13

144 Cong. Rec. S6724 .................................................................................................14, 21

151 Cong. Rec. S1445 ..........................................................................................................5

H.R. Rep. No. 104-819 (1996) ..........................................................................................4

## PRELIMINARY STATEMENT

In the early 2000s, Defendant the Central Intelligence Agency ("CIA") declassified a decades-old document that claimed U.S. intelligence services employed two Nazi war criminals, Ante Pavelic and Father Krunoslav Draganovic, to organize espionage efforts in Europe after World War II.  Plaintiff Sonoma Films LLC ("Sonoma"), a documentary production company founded by journalist David Schneider, has been trying for years to find out if that allegation is true.  It now falls to this Court to decide if Sonoma will learn the answer to that simple question.

As part of its investigation, Sonoma submitted a Freedom of Information Act ("FOIA") request to the CIA for records related to the U.S. government's employment of Pavelic and Draganovic, and the CIA belatedly produced a limited number of redacted or partial documents in response, all but one of which had already been made public.  Sonoma appealed that insufficient production, and after waiting nearly two years for a response that never came, Sonoma filed this lawsuit.  Following an additional year and a half of preliminary litigation, Sonoma now respectfully submits this cross-motion for summary judgment and opposes the CIA's motion for summary judgment.  For the reasons below, the Court should deny the CIA's motion and grant Sonoma's cross-motion because the CIA has violated FOIA with its inadequate search for and improper withholding of these historical but important public records.

**First**, the CIA has erroneously applied the ordinary FOIA exemption standards to the responsive records, instead of the more demanding standards specifically applicable to Nazi war criminal records.  The CIA's arguments against applying those heightened standards here ignore the relevant statutory text and Congress's intent in shedding light on these archival materials.

**Second**, even if the ordinary FOIA standards did apply to these records, the CIA still has not justified its withholdings.  The CIA relies on Exemption 1 to withhold responsive records in

1

whole or in part, but that exemption requires the government to draw a logical or plausible connection between withholding information and preventing harm to national security, and the CIA cannot possibly articulate such a risk of harm with respect to the release of these records, which speak to events that took place more than 75 years ago, at times in countries that no longer even exist. The CIA also claims that it can keep secret the same material under Exemption 3 and the CIA Act and/or the National Security Act, but in doing so the CIA relies on boilerplate arguments that do not actually justify its withholdings. Finally, citing Exemption 6, the CIA has withheld "personally identifying information" from the responsive records, but in doing so the agency asserts a substantial privacy interest where none exists, and the agency fails to demonstrate a reasonably foreseeable risk of harm to any current personal privacy interest from the disclosure of this historical information.

**Third**, even if the Court were to find that the CIA has carried its burden of showing that any of these exemptions applies to some of the information in the responsive records, the CIA still has not justified withholding several of those records in full rather than segregating the exempt material within those documents and releasing the remainder.

**Fourth**, the CIA fails to show that the search it conducted – which bypassed the agency's operational files and overlooked more than a dozen responsive records available on the CIA's own website – was reasonably calculated to uncover all responsive documents, as FOIA requires.

For these reasons and as set forth below, the Court should deny the CIA's motion for summary judgment, grant Sonoma's cross-motion for summary judgment, conduct an *in camera* review of the requested records, order the CIA to release the portions of the records it has improperly withheld, and direct the CIA to conduct supplemental searches for additional records responsive to Sonoma's request.

## BACKGROUND AND PROCEDURAL HISTORY

**I.    Ante Pavelic and Father Krunoslav Draganovic**

During World War II, Ante Pavelic served as the "Poglavnik" – the Croatian equivalent of "Fuhrer" – of the Ustashe, the Croatian Catholic military government, which allied itself with Nazi Germany and expelled, forcibly converted, imprisoned, and exterminated hundreds of thousands of non-Catholics, mostly of Jewish and/or Serbian heritage.[1]  Father Krunoslav Draganovic served as an Ustashe lieutenant colonel during World War II and later became the Vice Chief of the Ustashe's Bureau of Colonization, which was primarily responsible for the redistribution of property taken from dead or deported Serbs.[2]

According to the U.S. State Department, following the war "Pavelic hid in Rome at various locations from 1946 until his flight to Argentina in November 1948 without any decisive action by the U.S. or British authorities to apprehend him and make him available for a war crimes trial."[3]  During roughly the same period of time, Draganovic "helped Ustash[e] fugitives," including Pavelic, to "emigrate illegally to South America by providing temporary shelter and false identity documents, and by arranging onward transport, primarily to Argentina" via a clandestine escape system colloquially known as a "rat line."[4]

---

[1] *See, e.g.*, *Ante Pavelic*, Yad Vashem Shoah Resource Center, https://www.yadvashem.org/odot_pdf/Microsoft%20Word%20-%205705.pdf.

[2] *See, e.g.*, David M. Crowe, *Crimes of State Past and Present: Government-Sponsored Atrocities and International Legal Responses* 72-73 (2013).

[3] *See Report Summary: U.S. and Allied Wartime and Postwar Relations and Negotiations With Argentina, Portugal, Spain, Sweden, and Turkey on Looted Gold and German External Assets and U.S. Concerns About the Fate of the Wartime Ustasha Treasury*, U.S. Dep't of State, https://1997-2001.state.gov/regions/eur/rpt_9806_ng_summhtml.html.

[4] *Id.*

II.     **The Nazi War Crimes Disclosure Act**

In 1998, Congress enacted the Nazi War Crimes Disclosure Act ("NWCDA"), which

amended FOIA and requires federal agencies to "locate, identify, inventory, recommend for

declassification, and make available to the public at the National Archives and Records

Administration" any classified records concerning war crimes committed by Nazi Germany and

its allies.  Pub. L. No. 105-246, § 2(c)(1).  In introducing a precursor bill, Rep. Carolyn Maloney

stated that new legislation was required to close "a tremendous loophole in the FOIA" that

allows "[g]overnment agencies to block the release of information for a variety of reasons,

including outdated 'national security' arguments no longer valid in the post Cold War era."  *See*

H.R. Rep. No. 104-819, Pt. 1 § III (1996).  In determining whether to recommend passage of that

earlier bill, the House Government Reform and Oversight Committee recognized that disclosure

of Nazi war criminal records might conceivably harm U.S. interests, but it concluded that, "more

than half a century after the Second World War, it is time to end the near blanket exemption of

Nazi war crimes information from FOIA requests."  *Id.*

When that precursor law did not achieve Congress's goal of ensuring the prompt and

comprehensive release of Nazi war crime records, Congress doubled down and drafted the

NWCDA.  The NWCDA defines the phrase "Nazi war criminal records" to mean any "classified

records or portions of records that . . . pertain to any person with respect to whom the United

States Government, in its sole discretion, has grounds to believe ordered, incited, assisted, or

otherwise participated in the persecution of any person because of race, religion, national origin,

or political opinion, during the period beginning on March 23, 1933, and ending on May 8, 1945,

under the direction of, or in association with" the Nazi government of Germany or any

government cooperating with, occupied by, or established with the assistance or cooperation of

the Nazi government.  Pub. L. No. 105-246, § (3)(a).  The NWCDA further establishes "a presumption that the public interest in the release of Nazi war criminal records will be served by disclosure and release of the records."  *Id*. § 3(b)(3)(A).  The NWCDA enumerates certain categories of information that are exempt from release, which are for the most part more restrictive than the ordinary FOIA withholding standards.  *Id.* § 3(b)(2).  The NWCDA states that "[t]he exemptions set forth in [the NWCDA] shall constitute *the only authority* pursuant to which an agency head may exempt records otherwise subject to release under" the NWCDA.  *Id.* § 3(b)(3)(A) (emphasis added).

The NWCDA also directs the President to establish the "Nazi War Criminal Records Interagency Working Group" (the "IWG"), *id*. § 2(b)(1), which was tasked with coordinating agencies' efforts to fulfill the statute's mandate.  *See* Nazi War Crimes & Japanese Imperial Government Records Interagency Working Group, *Final Report to the United States Congress* 1 (Apr. 2007) (the "IWG Report"), https://www.archives.gov/files/iwg/reports/final-report-2007.pdf.  These efforts led to the declassification and public release of over 8.5 million pages of World War II and post-war records.  *Id*. at 2.

Even after the enactment of the NWCDA, however, the CIA refused to disclose records unless they "contained either direct information about war crimes or information suggesting that there were grounds to believe that the subject was involved in war crimes, acts of persecution, or looting."  *Id*. at 47; *see also* 151 Cong. Rec. S1445, S1447 (statement of Sen. Leahy that Congress "know[s] that the CIA is reluctant to provide documents related to Nazi war criminals that are 50 years old and older").  But in 2005, following years of delay and disagreement, the CIA finally yielded to the IWG's broader interpretation and (1) "declassified and released information on individuals connected to the Nazis whether war criminals or not";

(2) "declassified and released operational project files where Nazis were involved"; and

(3) "undertook additional searches that the [IWG] historians or CIA thought necessary." *See* IWG Report at 50 (cleaned up).

Among the records the CIA has released under the NWCDA are documents concerning Pavelic and Draganovic, which have been declassified and made public via the CIA website and the National Archives. *See, e.g.*, *Second Release of Name Files Under the Nazi War Crimes and Japanese Imperial Gov't Disclosure Acts*, CIA, https://catalog.archives.gov/id/139330029. One of these is a one-page "Document Transfer and Cross Reference," dated November 21, 1958, which summarizes a prior report dated August 25, 1948. *See* Compl. Ex. J (ECF 1-10). The "Subject of Document" field indicates the prior record relates to the "Italo-American Trading Company and Jugoslav Anti-TITO Activity," and the "Pertinent Information" field states:

> d) That the U.S. Intelligence Service employs PAVELIC, currently hidden in Rome, as "Commander" of its espionage groups sent into Jugoslavia out of Italy and Austria; uses Father Krunoslav DRAGONOVITCH, Ecclesiastical College of St. Girolamo of the Illirians, Rome, as "organizer" of local (Rome) espionage groups; and also employs at least one other Rome priest, Father Augustin Juretich, of the same address as DRAGONOVITCH, in this work.

*Id.* The record does not reveal the source of these allegations, but the truth of the statement should be known to the U.S. government.

## III.    Sonoma's FOIA Request And The CIA's Response

On July 24, 2019, Sonoma submitted a FOIA request (the "Request") to the CIA seeking "information and records on the Italo-American Trading Company," including a complete copy of the "Document Transfer and Cross-Reference" record discussed above, as well as "information in this and other documents related to Ante Pavelic and/or Krunoslav Draganovic in connection with any information gathering or operations they conducted at the behest of the

U.S. government during the post-World War II era and Cold War." *See* ECF 22-3 at 2. The CIA responded six days later with "a quick acknowledgment" confirming receipt of the Request, which summarized it as seeking "records on the Italo-American Trading Company, in particular any information on Ante Pavelic and/or Krunoslav Draganovic and their involvement in operations conducted at the behest of the U.S. Government during the Post World War II era and Cold War." *See* ECF 22-3 at 5. The CIA did not state that it was reformulating the Request as summarized, nor did it invite Sonoma to raise objections, if any, to that summary. *See id.*

In October 2020, the CIA produced a one-page document in its entirety as well as seven partially redacted documents, citing FOIA Exemptions 1, 3, and 6 as grounds for withholding the redacted information. *See* ECF 22-3 at 7. Seven of these documents had been declassified between 2001 and 2008 under the NWCDA and were already publicly available on the CIA's website, and the one-page document that the CIA produced in its entirety is actually the second page of a two-page document that is likewise available online.[5] Moreover, some of the information that the CIA redacted from these records as produced to Sonoma is unredacted in the online copies of these same documents, and, conversely, some of the online copies redact information that is unredacted in the versions produced to Sonoma. *Compare* Compl. Exs. C-I, *with* Compl. Exs. J-P.

In December 2020, Sonoma administratively appealed the CIA's response. *See* Compl. Ex. R. The CIA acknowledged receipt of that appeal, *see* Compl. Ex. S, but it did not respond substantively to the appeal before FOIA's statutory deadline.

---

[5] *See Official Dispatch from Chief of Base, Munich*, CIA, https://www.cia.gov/readingroom/document/519a6b2a993294098d5116e5.

**IV.    This Lawsuit**

On November 8, 2022, nearly two years after it submitted the FOIA appeal without having received a substantive response, Sonoma filed its Complaint against the CIA in this matter.  *See generally* Compl.  The Complaint asserts a single count under FOIA for constructive denial of Sonoma's appeal and seeks a declaratory judgment that the CIA has violated FOIA, an order directing the CIA to release the requested records in full, and an award of Sonoma's fees and costs pursuant to the fee-shifting provision of FOIA.  Compl. at 10.  The CIA filed its Answer on January 19, 2023, asserting that Sonoma "is not entitled to compel production of records exempt from disclosure by one or more exemptions or exclusions to the FOIA."  *See* Answer at 7 ("First Defense") (ECF 10).  The CIA subsequently represented that it was "reviewing its withholdings and the adequacy of its search."  *See* Feb. 15, 2023 J. Status Rep. at 1 (ECF 11).  The Court then ordered the CIA to complete that review and perform additional searches for responsive records by March 31, 2023.  *See* Feb. 22, 2023 Minute Order.

On March 22, 2023, the CIA notified Sonoma that it had completed its supplemental search, which located ten responsive documents.  *See* ECF 22-3 at 19.  The CIA released one of the records in full and seven of the records in part – the same eight records that the agency had already produced – and withheld the remaining two records in full.  *Id.*  The CIA continued to cite Exemptions 1, 3, and 6 as the grounds for its withholdings.  *Id.*  Seven of these eight documents were publicly available prior to Sonoma's initial request, however, and were marked as having been released pursuant to the NWCDA.[6]

---

[6] *See, e.g.*, *Dispatch from Chief of Station, Austria*, CIA, https://www.cia.gov/readingroom/document/519a6b2a993294098d51172c.

Pursuant to this Court's Standing Order for Civil Cases, the CIA provided Sonoma with a draft declaration and *Vaughn* index. *See* July 6, 2023 J. Status Rep. (ECF 14). After reviewing those materials, Sonoma maintained that (1) the CIA's search was inadequate and (2) the CIA's withholdings are improper, whether evaluated under the ordinary FOIA exemption standards or under the NWCDA. *See* Dec. 15, 2023 J. Status Rep. (ECF 19). The Court accordingly set a briefing schedule for cross-motions for summary judgment. *See* Jan. 2, 2024 Minute Order.

On March 15, 2024, the CIA moved for summary judgment (ECF 22). In its Memorandum of Points and Authorities in Support of that Motion ("CIA Mem."), the CIA argues that it conducted an adequate search for and properly withheld responsive records, in whole or in part, under Exemptions 1, 3, and 6. *See generally* ECF 22-1. Sonoma now opposes the CIA's motion for summary judgment and cross-moves for summary judgment on the grounds that the CIA's withholdings are improper and that the CIA failed to conduct a sufficient search for records responsive to Sonoma's request.

## <u>ARGUMENT</u>

## I.    STANDARD OF REVIEW

A court reviewing motions for summary judgment in a FOIA case must conduct a *de novo* review of the record "to ascertain whether the agency has sustained its burden of demonstrating that the documents are not agency records or are exempt from disclosure under the FOIA." *In Def. of Animals v. NIH*, 543 F. Supp. 2d 83, 92-93 (D.D.C. 2008) (cleaned up). A court may then grant summary judgment to the government only if the government's filings "describe the justifications for nondisclosure with *reasonably specific* detail, demonstrate that the information withheld <u>logically</u> falls within the claimed exemption, and are *not controverted* by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (emphases added). Underlying this analysis is the

principle that FOIA's objective is "'to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny,'" and that its exemptions should be "construed narrowly in keeping with FOIA's presumption in favor of disclosure." *Pub. Citizen v. OMB*, 598 F.3d 865, 869 (D.C. Cir. 2009) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 360-61 (1976)). Accordingly, the government "bears the burden of proving that an exemption applies." *Bartko v. Dep't of Justice*, 898 F.3d 51, 62 (D.C. Cir. 2018).

Where, as here, a FOIA plaintiff also disputes the adequacy of the search for responsive records, "[i]n order to obtain summary judgment the agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). In other words, the government must "demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (cleaned up).

## II. THE CIA FAILS TO JUSTIFY ITS WITHHOLDINGS

The CIA has not justified withholding the important historical records that Sonoma requested. The requested records qualify as Nazi criminal records under the NWCDA, and the NWCDA provides that such records may be withheld from the public only if they satisfy one or more of the narrow exemptions enumerated in the NWCDA itself. The CIA thus erred in withholding these Nazi war criminal records under ordinary FOIA exemption standards.

Moreover, the CIA has erred even under those ordinary FOIA standards. With respect to Exemption 1, the CIA has not provided a logical connection between disclosure of information about events that took place three quarters of a century ago or more and a risk of harm to national security today. On Exemption 3, the CIA relies on boilerplate, copy-and-paste

arguments that do not carry the agency's burden to justify its withholdings. And as to Exemption 6, the CIA fails to demonstrate any privacy interest in the information it has withheld or satisfy the foreseeable harm standard. The Court should accordingly deny the CIA's motion for summary judgment and grant Sonoma's cross-motion on the CIA's withholdings.

### A.    The CIA Improperly Applied General FOIA Exemption Standards Instead Of The NWCDA's Heightened Standards For Nazi War Criminal Records.

The CIA does not dispute, nor could it, that records relating to Pavelic and Draganovic qualify as Nazi war criminal records under the NWCDA, given that both men indisputably "ordered, incited, assisted, or otherwise participated in" widespread persecution on account of "race, religion, national origin, or political opinion" between March 23, 1933 and May 8, 1945, "under the direction of, or in association with" the Croatian Catholic military government, which "was an ally of the Nazi government of Germany." *See* NWCDA § 3(a)(1). The CIA further concedes that information subject to the NWCDA may be withheld from the public only under the narrow set of exemptions enumerated in the NWCDA itself. *See* CIA Mem. at 12 (citing NWCDA § 3(b)(2)(A)-(G)). And the CIA does not even attempt to argue that its withholdings satisfy the NWCDA. Instead, the CIA's only argument as to the NWCDA is that, with one exception not relevant here, the law "does not affect new FOIA requests" because the IWG has already "executed its obligations under the [NWCDA]." *Id.* at 11-12. Yet the CIA cites no authority for that position, and it ignores the fact that the government continued to release Nazi war crime records pursuant to the NWCDA even *after* the IWG ostensibly completed its efforts. *See generally* Decl. of David Schneider & Exs. A-C.

The CIA is also wrong as a matter of statutory interpretation. "To interpret the statute, we begin by examining the text." *Advanced Energy United v. FERC*, 82 F.4th 1095, 1109 (D.C. Cir. 2023). The text of the NWCDA establishes the IWG, *see* NWCDA § 2(b)-(d); then defines

Nazi war criminal records, *id.* § 3(a); and then states that, subject only to the NWCDA's narrow

exemptions, the IWG "shall release in their entirety Nazi war criminal records" as the statute

defines that term, *id.* § 3(b)(1)-(2).  Crucially, the NWCDA also provides, *inter alia*, that "[t]he

exemptions set forth [in the NWCDA] shall constitute the *only* authority pursuant to which an

agency head may exempt records *otherwise subject to release*" by the IWG.  *Id.* § 3(b)(3)

(emphasis added).  The relevant question, then, is whether the records that Sonoma requested are

"otherwise *subject to* release" under the NWCDA – not whether the IWG did in fact release them

or would ever do so.  "The most natural reading" of this language, *see Republic of Sudan v.*

*Harrison*, 587 U.S. 1, 8 (2019), provides the answer: because the records Sonoma requested are

Nazi war criminal records, they are still "subject to" release under the NWCDA.  As a result the

narrow exemptions enumerated in the NWCDA are "the only authority pursuant to which [the

CIA] may exempt" those records.

Even if the plain text of the NWCDA were considered ambiguous on this point, the

legislative history squarely support Sonoma's reading of the NWCDA as continuing to provide

maximum transparency for Nazi war criminal records found in the government's files.  *See, e.g.*,

*United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1352 (D.C. Cir. 2002) ("Where the

language is subject to more than one interpretation and the meaning of Congress is not apparent

from the language itself, the court may be forced to look to the general purpose of Congress in

enacting the statute and to its legislative history for helpful clues.").  There can be no doubt that

the intent of Congress in passing the NWCDA was to shine the bright light of public disclosure

on long-secret agency records about Nazi war crimes and criminals.  The author of the House

version of the bill, Rep. Carolyn Maloney, stated exactly that:

> [T]he intent of this legislation is to bring to light information which
> may be in the files and archives of the United States Government.

> This may well include information from the post-war period
> showing a relationship between those agencies and Nazi war
> criminals. It is not our intent that the exemptions included in the bill
> be used to shield this type of information from disclosure. We have
> included the exemptions that currently exist in Executive order.
> They should not be revoked simply to protect any agency from
> embarrassment.

144 Cong. Rec. H7295, H7296.  The other lead sponsor in the House, Rep. Stephen Horn, stated

that the NWCDA was necessary because "[m]uch of the government information on alleged

Nazi war criminals has remained secret even though many researchers have filed Freedom of

Information Act requests to secure copies of the records," as "[f]ederal agencies have routinely

denied these requests citing exemptions for national defense, foreign relations, and intelligence."

*Id.*  Rep. Horn added, "More than a half century after the Second World War, it is time to end the

sweeping equity exemptions that have shielded Nazi war crimes and criminals from full public

disclosure."  *Id.*  Sen. Daniel Patrick Moynihan, the bill's co-sponsor in the Senate, similarly

noted that the NWCDA would make an impact because "[r]esearchers seeking information on

Nazi war criminals are denied access to relevant materials in the possession of the United States

Government, even when the disclosure of these documents no longer poses a threat to national

security—if indeed such disclosure ever did."  143 Cong. Rec. S11764, S11774.  Sen. Herb

Kohl, another of the bill's original co-sponsors, specifically stated that the NWCDA "is targeted

to information solely related to Nazi war crimes and to transactions involving Nazi victims, yet it

sets an important precedent in codifying a more narrow set of privacy and national security

exceptions for the release of Government information through the Freedom of Information Act."

*Id.* at S11775.

The legislative history clearly evinces that Congress was trying to maximize transparency

of Nazi war criminal records and ensure that federal agencies could withhold those records from

the public only on the narrow bases set out in the NWCDA itself.  Indeed, Congress enacted the

NWCDA and created the IWG only after FOIA alone failed to secure the release of Nazi war criminal records and a prior legislative effort, the War Crimes Disclosure Act of 1996, still could not overcome agency recalcitrance.  *See, e.g.*, 144 Cong. Rec. S6724, S6727 (statement of Sen. Leahy that NWCDA would put Congress's previous "words into action").  Nothing in this legislative history suggests, as the CIA would have it, that Congress intended for the NWCDA to be only a temporary fix such that researchers and journalists and others would go back to facing improper and unjustified denials in response to their requests for Nazi war criminal records once a few years had passed after the NWCDA's enactment.

Thus, even if the Court were to view the NWCDA as ambiguous on this point, the Court should still conclude, based on the legislative history, that the CIA must continue to satisfy the NWCDA's specific exemptions, not merely FOIA's general exemptions, to withhold Nazi war criminal records.  *See Braxtonbrown-Smith*, 278 F.3d at 1352 ("[T]he court must avoid an interpretation that undermines congressional purpose considered as a whole when alternative interpretations consistent with the legislative purpose are available.").

Because the CIA has not even justified its withholdings under FOIA, *see infra*, it utterly fails to justify its withholdings under the NWCDA.  In withholding material under Exemption 1, the CIA asserts that "releasing the information withheld could reasonably be expected to cause damage to national security by disclosing information relating to intelligence activities, sources and methods, and foreign relations or activities."  Williams Decl. (ECF 22-2) ¶¶ 27-34.  To withhold this material under the NWCDA, however, the CIA must demonstrate that disclosure would "reveal the identity of a confidential human source, or reveal information about the application of an intelligence source or method, or reveal the identity of a human intelligence source when the unauthorized disclosure of that source would *clearly and demonstrably damage*

14

the national security interests of the United States," or "reveal information that would *seriously and demonstrably impair* relations between the United States and a foreign government, or *seriously and demonstrably undermine* ongoing diplomatic activities of the United States." *See* NWCDA § 3(b)(2)(B) & (G) (emphases added).

The CIA's Exemption 1 arguments do not satisfy the NWCDA because the CIA has not even argued, let alone shown, that disclosure would "clearly and demonstrably damage" national security interests or "seriously and demonstrably impair" or "seriously and demonstrably undermine" foreign relations. *See id.* § 3(b)(2)(B) & (G). The Court should therefore reject the CIA's putative Exemption 1 withholdings as insufficiently justified under the NWCDA. Likewise, in withholding material under Exemption 3, the CIA asserts that it is keeping some information secret "to protect CIA sources and methods" per the National Security Act and other information secret to shield "personally-identifying information of Agency personnel" per the CIA Act. *See* Williams Decl. ¶¶ 37-42. Yet the CIA asserts that disclosure of this information would risk only "*potential* damage to national security," *id.* ¶ 42 (emphasis added), which again falls far short of the NWCDA's requirement of demonstrating that disclosure would "*clearly* and *demonstrably* damage" national security, *see* NWCDA § 3(b)(2)(B) (emphasis added). The Court should therefore reject the CIA's putative Exemption 3 withholdings as well.

Because Nazi war criminal records are subject to the NWCDA's specific exemption standards, not FOIA's general exemption standards, the CIA has failed to justify withholding responsive records in whole or in part under Exemptions 1 or 3.[7] The Court should therefore

---

[7] Because FOIA Exemption 6 and NWCDA § 3(b)(2)(A) both permit the government to withhold records where disclosure would "constitute a clearly unwarranted invasion of personal privacy," the CIA's failure to justify its Exemption 6 withholdings is discussed separately below.

deny the CIA's motion for summary judgment as to those withholdings, grant Sonoma's cross-motion, and order the CIA to promptly produce the material withheld under those exemptions.

**B.    Even Under Ordinary FOIA Exemption Standards, The CIA Has Not Justified Its Withholdings.**

Even if the NWCDA did not apply to the Nazi war criminal records that Sonoma requested, the CIA still failed to justify withholding those records in whole or in part under the ordinary FOIA exemption standards.

**1.    The CIA Has Not Justified Its Withholdings Under Exemption 1**

The CIA has withheld certain of the records that Sonoma requested in whole or in part under Exemption 1, which allows an agency to withhold records that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). The propriety of withholding classified information turns on the criteria set out in Executive Order 13,526. Williams Decl. ¶¶ 24-25. Under that order, "classified information must pertain to at least one of eight subject-matter classification categories." *Jud. Watch v. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013). Moreover, "disclosure of that information must reasonably be expected to cause some degree of harm to national security." *Id.*

Under FOIA, an agency asserting Exemption 1 bears "the burden of demonstrating a connection between the withheld information and harm to national security," and this connection must be "logical or plausible." *CNN v. FBI*, 384 F. Supp. 3d 20, 35 (D.D.C. 2019), *vacated in part on other grounds*, 984 F.3d 114, 116 (D.C. Cir. 2021). The CIA has not carried this burden because it cannot and does not identify a "logical" or "plausible" connection between disclosing decades-old information and a risk of harm to national security today.

16

This Court has the authority to reject the CIA's withholdings on this basis. For example, in *CNN v. FBI*, the court rejected the FBI's attempt to withhold, under Exemption 1, the name of a country about which the President had spoken positively, concluding that the government "must set forth a logical connection between disclosure and damage to national security" and that "[i]n this factual circumstance, the [agency] has not articulated the links to forge such a chain." 384 F. Supp. 3d at 36. The court rejected two additional Exemption 1 withholdings in that case, noting that "the Government cannot justify its actions simply by invoking the phrase 'national security.'" *Id.* at 38 (cleaned up).

Similarly, in *Rosenberg v. Department of Defense*, 342 F. Supp. 3d 62 (D.D.C. 2018), the government withheld information under Exemption 1 reflecting "the reactions of [Guantánamo] detainees upon learning of their transfer" to other countries, arguing that releasing this material would cause "significant national security risks." *Id.* at 85-86. The court found the asserted link between the release of this information and the alleged risk of harm to be "tenuous at best," explaining that "[i]nformation about a detainee's feelings or thoughts about his impending transfer would not seem to pose the same security risk as, say, information regarding how or when the detainees are being transferred, or the name of the receiving nation." *Id.* at 86. The court thus denied the government's motion for summary judgment as to those withholdings, finding that it could not "discern, even affording due deference to the agency on national security matters as required, a logical connection between the disclosure of [the requested information] and a risk to the national security." *Id.*[8]

---

[8] On reconsideration, the court maintained that this information did not fall within the scope of Exemption 1, but it allowed the government to withhold the material on the separate grounds that it was "too intertwined" with other, properly-exempt information. *Rosenberg v. Dep't of Def.*, 442 F. Supp. 3d 240, 255 (D.D.C. 2020).

The CIA's Exemption 1 withholdings here fail just like those in *CNN* and *Rosenberg*. Indeed, the withholdings here are in some ways even less logical or plausible, because in those cases the information at issue was at least somewhat recent. The Court should therefore reject these Exemption 1 withholdings as well.

### 2.    The CIA Has Not Justified Its Withholdings Under Exemption 3

The CIA also fails to justify its withholdings under Exemption 3, which authorizes an agency to withhold records that are "specifically exempted from disclosure by statute . . . , if that statute . . . requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or . . . establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3)(A). Here, the CIA first cites Section 102A(i)(l) of the National Security Act of 1947, *see* CIA Mem. at 21, which "directs that the Director of National Intelligence 'shall protect intelligence sources and methods from unauthorized disclosure,'" *see id.* (quoting 50 U.S.C. § 3024(i)(1)). The CIA also cites the CIA Act, *see* CIA Mem. at 21-22, which provides that the CIA is "exempted from" the provisions of law that otherwise would require disclosure of "the names, official titles, salaries, or numbers of personnel employed by the Agency," *see* 50 U.S.C. § 3507.

The CIA's burden in asserting Exemption 3, as tied to these provisions, is to establish that the information it seeks to withhold "can reasonably be expected to lead to unauthorized disclosure" of intelligence sources and methods or personally identifying information about CIA personnel. *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982). The CIA's *Vaughn* index fails to carry this burden. When an agency asserts its rationale for withholdings in a *Vaughn* index, the index should be "written in terms of" information, not documents, because "the focus in the FOIA is information, not documents, and an agency cannot justify withholding an entire

18

document simply by showing that it contains some exempt material." *Krikorian v. Dep't of State*, 984 F.2d 461, 467 (D.C. Cir. 1993). The index should "*specifically* identify[] the reasons why a particular exemption is relevant and correlat[e] those claims with the particular part of the withheld document to which they apply." *Id.* (emphasis added).

Here, of the 7 documents that the CIA withheld in whole or in part under the CIA Act and Exemption 3, the CIA's *Vaughn* index includes the following sentence verbatim or nearly so for all 7 entries: "Exemption (b)(3) (CIA Act) was asserted to protect organization information and CIA personnel identifying information (e.g., names, employee numbers, titles, emails, duties, training)." *See* ECF 22-4 at 1-5 (*Vaughn* index entries C00466670, C06864193, C06864194, C06864195, C00465913); *id.* at 4 (adding "and signatures" to the same sentence for *Vaughn* index entry C06864196); *id.* at 6 (replacing "duties" with "functions/duties" for *Vaughn* index entry C06493782). So too for the documents that the CIA withheld in whole or in part under the National Security Act and Exemption 3: on its *Vaughn* index the CIA states only and non-specifically that those withholdings protect "internal Agency code markings" or "cryptonyms" or "locations of CIA intelligence interests." *See* ECF No. 22-4 at 2-6. These repeated assertions of essentially identical, generic language do not suffice for the CIA to carry its burden to justify its withholdings. *See, e.g.*, *NPR v. Dep't of Homeland Sec.*, No. 1:20-cv-2468-RCL, 2022 WL 4534730, at *7 (D.D.C. Sept. 28, 2022) (rejecting withholdings under another exemption where "[e]very single entry in the *Vaughn* index repeats [the same] justification," which the court characterized as "boilerplate").

Indeed, while courts generally defer to an agency on its assertions of Exemption 3, "no matter how much a court defers to an agency, its review is not vacuous." *CNN*, 384 F. Supp. 3d at 35 (cleaned up). That is because "deference is not equivalent to acquiescence." *Campbell v.*

*Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998).  Given that the justifications for the

Exemption 3 withholdings discussed above are clearly deficient, even with all due deference the

Court should reject the CIA's withholdings under Exemption 3 as insufficiently justified.

### 3.      The CIA Has Not Justified Its Withholdings Under Exemption 6

The CIA states that it has "withheld personally identifying information" of CIA

employees and "non-CIA personnel," including "names, titles, positions, functions, duties, and

communications" under Exemption 6.  CIA Mem. at 23.  Exemption 6 allows the government to

withhold such information when its disclosure "would constitute a clearly unwarranted invasion

of personal privacy."  5 U.S.C. § 552(b)(6).  To assess "whether the disclosure of the

information at issue . . . would rise to the level of a clearly unwarranted invasion of personal

privacy," courts therefore "balance the public interest in disclosure against the interest Congress

intended Exemption 6 to protect."  *Am. Immigr. Lawyers Ass'n v. Exec. Office for Immigr. Rev.*,

830 F.3d 667, 673 (D.C. Cir. 2016) (cleaned up).  The D.C. Circuit has further instructed that

courts "must bear in mind that FOIA mandates a strong presumption in favor of disclosure, and

that the statutory exemptions, which are exclusive, are to be narrowly construed."  *ACLU v.

Dep't of Justice*, 655 F.3d 1, 5 (D.C. Cir. 2011) (cleaned up).  The Court need not even

undertake this balancing text, however, when "disclosure would compromise" only "a *de

minimis*[] privacy interest," because "[i]f no significant privacy interest is implicated (and if no

other Exemption applies), FOIA demands disclosure."  *Nat'l Ass'n of Retired Fed. Emps. v.

Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989).

Here, the CIA asserts Exemption 6 to redact the names of the authors of five reports and

memoranda relating to Nazi war criminals published between May 1945 and April 1959.  *See*

ECF 22-4 at 1-4.  On the privacy end of the balancing test, the CIA does not even represent that

these authors are still alive, and in fact it acknowledges that one or more of these individuals may have been "deceased for many years." *See* CIA Mem. at 23-24. The CIA treats that fact as immaterial, but the D.C. Circuit has held that "the privacy interest in nondisclosure of identifying information may be diminished where the individual is deceased," and thus "[t]he fact of death . . . , while not *requiring* the release of information, is a relevant factor to be taken into account in the balancing decision whether to release information." *Schrecker v. Dep't of Justice*, 349 F.3d 657, 661 (D.C. Cir. 2003) (cleaned up and emphasis added). All the more so here, where the drafters of the NWCDA expressly "expect[ed] the Department of Justice and other agencies to follow the majority rule that death extinguishes a person's privacy rights." *See* 144 Cong. Rec. S6724, S6729 (statement of Sen. Patrick Leahy). Because there is only a *de minimis* privacy interest in the names of these authors, therefore, the Exemption 6 balancing test necessarily weighs in favor of disclosure. *Horner*, 879 F.2d at 874.

Moreover, unlike with Exemptions 1 and 3, the CIA must satisfy the foreseeable harm standard with its Exemption 6 claims, yet the CIA merely asserts that disclosing the information it withheld under Exemption 6 "could" result in undesirable consequences. *See* CIA Mem. at 23; Williams Decl. ¶ 44. The CIA's threadbare *Vaughn* index calls its Exemption 6 claims into even further doubt. All 5 entries in the *Vaughn* index for records with Exemption 6 withholdings state only that the CIA withheld "names and other personal information of CIA personnel that would constitute a clearly unwarranted invasion of personal privacy." *See* ECF 22-4 at 1-4; *see also id.* at 1 (adding that the CIA withheld "the identities of non-CIA personnel" as well). These copy-and-paste arguments underscore the CIA's failure to engage in an *individualized* weighing of privacy interests against public interests, as Exemption 6 requires. *See, e.g.*, *WP Co. v. Dep't of Def.*, 626 F. Supp. 3d 69, 86 (D.D.C. 2022) (rejecting defendants' Exemption 6 claim and

ordering defendants to "conduct an individualized assessment of the public and private interests

with respect [to] the names of" former service members that defendants had withheld).

## III.    THE CIA HAS NOT JUSTIFIED WITHHOLDING ANY RECORDS IN FULL

Even if the Court were to find that the CIA has carried its burden of demonstrating that

some portion(s) of some record(s) could be withheld, FOIA still requires that "[a]ny reasonably

segregable portion" of the records be produced "after deletion of the portions which are exempt."

5 U.S.C. § 552(b).  To withhold any requested document in its entirety, therefore, an agency

"must demonstrate that it cannot segregate the exempt material from the non-exempt."

*Hertzberg v. Veneman*, 273 F. Supp. 2d 67, 90 (D.D.C. 2003) (citing *Kimberlin v. Dep't of

Justice*, 139 F.3d 944, 949-50 (D.C. Cir. 1998)).  "[A] blanket declaration that all facts are so

intertwined to prevent disclosure under the FOIA does not constitute a sufficient explanation of

non-segregability."  *Wilderness Soc'y v. Dep't of Interior*, 344 F. Supp. 2d 1, 19 (D.D.C. 2004);

*see also Mead Data Cent. v. Dep't of Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977) ("[I]f the

Air Force decides to continue in its claim that the non-exempt material in these documents is not

reasonably segregable . . . , it must provide a more detailed justification than the conclusory

statements it has offered to date.").  Instead, "[t]o justify withholding a document in full, an

agency must show with reasonable specificity why the document cannot be further segregated, or

why the document is not reasonably segregable – for example, because the nonexempt material

would be an essentially meaningless set of words and phrases."  *EPIC v. Dep't of Homeland

Sec.*, 926 F. Supp. 2d 311, 315 (D.D.C. 2013) (cleaned up).

Here, the CIA asserts in conclusory fashion that "[i]n two instances where no segregable,

non-exempt portions of the document could be released without potentially compromising

classified information or information protected under the FOIA, the documents were withheld in

full." Williams Decl. ¶ 47; CIA Mem. at 27. This argument therefore lacks the type of "detailed

justification" that the D.C. Circuit requires. *See Mead*, 566 F.2d at 261.

## IV.    THE CIA FAILED TO CONDUCT A LEGALLY ADEQUATE SEARCH

Finally, the Court should reject the CIA's claim that it conducted an adequate search. For

an agency to obtain summary judgment on the adequacy of its search, it "must show that it made

a good faith effort to conduct a search for the requested records, using methods which can be

reasonably expected to produce the information requested." *Oglesby*, 920 F.2d at 68. That

includes filing "[a] reasonably detailed affidavit, setting forth the search terms and the type of

search performed, and averring that all files likely to contain responsive materials (if such

records exist) were searched." *Id.* In other words, the government must "demonstrate beyond

material doubt that its search was 'reasonably calculated to uncover all relevant documents.'"

*Valencia-Lucena*, 180 F.3d at 325.

Importantly, "plaintiffs can rebut an agency's declarations and affidavits by

demonstrating that there remains a genuine issue as to whether the agency performed an

adequate search for documents responsive to the plaintiff's request." *Long v. ICE*, 279 F. Supp.

3d 226, 233 (D.D.C. 2017). That is, although courts may "rely[] upon agency affidavits," "the

requester may nonetheless produce countervailing evidence, and if the sufficiency of the

agency's identification or retrieval procedure is genuinely in issue, summary judgment is not in

order." *Founding Church of Scientology v. NSA*, 610 F.2d 824, 836 (D.C. Cir. 1979). Although

"purely speculative claims about the existence and discoverability of other documents" do not

overcome the presumption of good faith of agency affidavits, *SafeCard Servs. v. SEC*, 926 F.2d

1197, 1200 (D.C. Cir. 1991), "if, in the face of well-defined requests and positive indications of

overlooked materials, an agency can so easily avoid adversary scrutiny of its search techniques,

the Act will inevitably become nugatory," *Founding Church*, 610 F.2d at 837.

Under these standards, the CIA's search was inadequate in several respects.  **First**, the CIA searched for records responsive to Sonoma's request as the CIA had reformulated that request in its acknowledgment letter, not as the request was originally submitted.  *See* CIA Mem. at 8-9.  The CIA cites no authority to support that course of action, which improperly limited the scope of the search from the start.  Moreover, that the CIA eventually "conducted an additional search" for the ostensible purpose of "alleviat[ing] [Sonoma's] concerns regarding the scoping of the request," *see id.* 9, more plausibly reads as a tacit concession that the CIA wrongly limited that scope than as a magnanimous and spontaneous gesture of agency good will.

**Second**, the agency refused to search for responsive records among its operational files on the sole grounds that the agency has previously searched through its operational files for Nazi war criminal records and released them.  *See* CIA Mem. at 6.[9]  But operational files that the CIA previously reviewed may not have been released at the time, in full or in part, based on NWCDA exemptions that applied then but no longer apply now.  The CIA's position would leave those files – previously unreleased yet currently excluded from searches – in a form of public records purgatory.  Moreover, the CIA does not even represent that the universe of documents constituting its operational files today is the same as the universe of documents that constituted its operational files at the time the CIA conducted that prior search.  At a minimum, therefore, the CIA should have searched for responsive records among the files designated operational today that were not so designated at the time of the prior search.

**Third**, while the CIA claims it "conducted an additional search for Pavelic and/or Draganovic and their involvement in information gathering or operations conducted at the behest

---

[9] The CIA ordinarily is not required to search its operational files for records responsive to a FOIA request, but that is not the case for Nazi war criminal records.  *See* NWCDA § 3(c).

of the U.S. Government during the post-World War II era and the Cold War," without limiting that search to records also related to the Italo-American Trading Company, *see* CIA Mem. at 9, that search apparently missed more than a dozen responsive documents available on the CIA's own website.  *See* Decl. of Maxwell S. Mishkin, Exs. A-M.[10]  This Court "may place significant weight on the fact that a records search failed to turn up a particular document in analyzing the adequacy of a records search."  *Duenas Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003).  The CIA thus cannot "demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'"  *Valencia-Lucena*, 180 F.3d at 325.  The Court should deny the CIA's summary judgment motion on this ground as well and direct the agency to conduct reasonable supplemental searches for additional responsive records.

## CONCLUSION

For the foregoing reasons, Sonoma respectfully requests that its cross-motion for summary judgment be granted, that the CIA's motion for summary judgment be denied, that the CIA be ordered to release the requested records in full and to conduct reasonable searches for any additional responsive material, and that Sonoma be awarded attorneys' fees and costs.

Dated:  May 10, 2024                    Respectfully submitted,

BALLARD SPAHR LLP

/s/ *Maxwell S. Mishkin*
Maxwell S. Mishkin (#1031356)
1909 K Street NW, 12th Floor
Washington, DC 20006
Tel: (202) 661-2200 | Fax: (202) 661-2299
mishkinm@ballardspahr.com

*Counsel for Plaintiff Sonoma Films LLC*

---

[10] The CIA grouses that Sonoma "has not indicated what searches or processes were used to locate these documents" in the CIA's Electronic Reading Room ("ERR").  *See* CIA Mem. at 9-10.  The process was entering the term "Draganovic" in the "Search Query for FOIA ERR" field and clicking the "search" button.  *See* Mishkin Decl. ¶ 1.